# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LINDSEY N., | ) |
| | ) |
|     Plaintiff, | ) |
| | )   No. 13-cv-05395 |
|     v. | ) |
| | )   Judge Andrea R. Wood |
| ANDREW MARSHALL SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal. *See* 42. U.S.C. § 405(g). The issue raised—one apparently not litigated frequently—is whether Plaintiff Lindsey N. qualifies for a waiver of overpayment of Social Security disability benefits. Over a period of nearly two years, Plaintiff was paid approximately $41,000 in benefits that everyone now agrees were mistakenly paid to her. When the Administration realized the mistake and asked Plaintiff to repay the money, she applied for a waiver, relying on procedure set forth in Administration regulations. An administrative law judge ("ALJ") found that Plaintiff did not qualify for a waiver because she could not meet the threshold requirement of showing she was "without fault." The ALJ found that Plaintiff made misrepresentations or omissions about her income from part-time work when she applied for benefits. The ALJ also found that Plaintiff later failed to report that her income had increased significantly. Plaintiff argues here that the ALJ erred in making these findings. After considering the parties' arguments and reviewing the relevant records, this Court concludes that a remand is required because the ALJ's findings were, at a minimum, unclear as to what exactly Plaintiff did wrong and the ALJ failed to explore several mitigating factors in Plaintiff's favor.

**BACKGROUND**

In the fall of 2003, during a time of physical distress and financial uncertainty, Plaintiff considered whether to apply for Social Security disability benefits. She was then working several part-time teaching jobs and hoped eventually to return to working full-time. But she was also suffering from Crohn's disease, a chronic incurable autoimmune disease, with fluctuating symptoms, causing her to use the bathroom frequently and unexpectedly, sometimes 20 times a day. Her doctor described her condition, in somewhat blunt terms, as permanent diarrhea. (R. 138.) Eventually, Plaintiff decided to apply, and did so on October 16, 2003, by going into a Social Security office and speaking with an Administration employee. Plaintiff was then 52 years old. This meeting is the central event in this case.

At the meeting, Plaintiff described her ongoing health problems, including that she had three surgeries to remove parts of her bowel and that she was currently receiving a biweekly 5-hour IV infusion to replace nutrients, as well as monthly B12 injections, and that she had multiple surgeries to remove recurring kidney stones, a side effect of Crohn's disease. (R. 138, 642.) Plaintiff told the employee that she had worked full-time in the late 1990s but had to quit because she spent 50% of the day in the bathroom. She then began working part-time teaching writing as an adjunct professor at three area colleges (City Colleges of Chicago, DePaul University, and Columbia College) and also did self-employed work writing articles for a newspaper. The benefit of working part-time in these jobs was that she could somewhat control her schedule to accommodate her unpredictable bathroom needs. But this work was not guaranteed; nor was it clear how her Crohn's disease would progress. The teaching was on an "as needed" basis, subject to semester-to-semester demands of the colleges, which meant that she could not predict whether, or how much, she would be teaching in the future. Plaintiff was also concerned about her financial

situation and whether she would be able to pay for a fourth intestinal resection surgery, if needed. Plaintiff raised these concerns with the employee and told her that she was applying for disability benefits with "great hesitation." (R. 641.) Plaintiff also brought various financial documents with her to the meeting, including tax returns and pay stubs.

According to Plaintiff, the Administration employee encouraged her to apply despite these concerns. The employee explained, among other things, that the Administration was then beginning a new Ticket to Work program and encouraged people getting disability benefits to try to transition back to working. (R. 749.) The employee helped Plaintiff complete several required Administration forms asking details about Plaintiff's jobs. She also submitted another form the next month, in November, asking for similar information.[1]

On December 8, 2003, the Administration informed Plaintiff that she had been approved for benefits.[2] However, in 2005, the Administration reviewed Plaintiff's file and concluded that she should not have been awarded benefits because her income from all her work exceeded the Administration's yearly limits for substantial gainful activity ("SGA"). Under Social Security Rules, if a claimant is making more than the SGA limit, then the claimant cannot receive benefits regardless of the severity of the health problems. The Administration requested that Plaintiff return the overpayment of $43,084 (the amount was later adjusted downward slightly) whereupon Plaintiff filed a request for a waiver. *See* 42 U.S.C. § 404(b)(1). Under the applicable rules, the

---

[1] The above summary comes primarily from two sources: Plaintiff's hearing testimony and a letter, dated October 16, 2003, that she submitted to the Administration. (R. 641–42.) Neither the ALJ nor the Government has disputed Plaintiff's testimony about this meeting. In any event, the contemporaneous letter provides additional verification as to what Plaintiff disclosed to the employee.

[2] According to one of Plaintiff's former attorneys, the "unusual speed" in processing Plaintiff's application (*i.e.*, less than two months) suggests it was "assigned a high priority" by the Administration. (R. 152.) Throughout this litigation, no one has questioned Plaintiff's contention that her health problems were severe.

3

Administration may waive the overpayment if the claimant was "without fault" and if recovery would not defeat the purpose of the Act or be against equity and good conscience. *Id.* In support of her waiver request, Plaintiff submitted financial records showing she could not afford to repay the money and was then living month-to-month and relying on the help of friends. (R. 136.)

The case was then litigated over a long period at the administrative level. Plaintiff hired several attorneys along the way, including one specializing in overpayment waivers, and she also submitted numerous documents and letter briefs on her own. The Court will not describe all of this history, except to note that Plaintiff diligently pursued this claim, travelling a long journey through several layers of bureaucracy, with a number of twists and turns and delays. (*See* R. 213–18 (summarizing the details).) In 2008, an ALJ located in Chicago held a hearing and then found that Plaintiff did not qualify for a waiver. (R. 34.) However, the Appeals Council eventually ordered a new hearing. (R. 219.) In 2011, a new ALJ, located in Washington, D.C., conducted a second hearing and later issued a written decision finding that Plaintiff did not qualify for a waiver. (R. 18–24.) This case is an appeal from that second ruling.

The ALJ found that Plaintiff was at fault, and therefore not entitled to a waiver, because she made conflicting, confusing, or inaccurate statements on the written forms submitted in the fall of 2003 as part of the initial application process. The representations related to the number of hours she worked and the amount she was paid at the three part-time teaching jobs. Although not directly stating so, the ALJ seemed to believe that, if Plaintiff had generally been honest, then the Administration never would have awarded her benefits because her income clearly exceeded the SGA limit. The ALJ's rationale rested on the premise that the Administration could not have simply made a mistake on its own accord. (*See* R. 22.) As an alternative rationale, the ALJ found that Plaintiff, after the initial application process, failed to inform the Administration that her

4

income and hours had increased significantly. Because the ALJ found that Plaintiff was at fault, the ALJ did not address the additional waiver requirements, including equity and good conscience.

## DISCUSSION

The basic legal framework for overpayment waivers is set forth in the Administration regulations—specifically, 20 CFR §§ 404.501-545. The ALJ relied generally on these provisions, although not all of them were discussed.[3] The ALJ did partially summarize 20 C.F.R. § 404.507 (hereinafter, "Section 507"), which defines the important phrase "without fault." It reads, in full, as follows:

> *Fault* as used in *without fault* (see §404.506 and 42 CFR 405.355) applies only to the individual. Although the Administration may have been at fault in making the overpayment, that fact does not relieve the overpaid individual or any other individual from whom the Administration seeks to recover the overpayment from liability for repayment if such individual is not without fault. In determining whether an individual is at fault, the Social Security Administration will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) the individual has. What constitutes fault (except for *deduction overpayments*—see §404.510) on the part of the overpaid individual [] depends upon whether the facts show that the incorrect payment to the individual [] resulted from:
>
>     (a) An incorrect statement made by the individual which he knew or should have known to be incorrect; or
>
>     (b) Failure to furnish information which he knew or should have known to be material; or

---

[3] Neither the ALJ, nor Plaintiff in her two briefs, have cited any federal cases interpreting these Administration provisions. The Government, in contrast, did cite a series of cases, many of which were older out-of-circuit cases, suggesting that these issues are not litigated frequently. The Government has cited these cases mostly to bolster its background argument that the "without fault" standard is generally strict—akin to strict negligence where even an "honest mistake" could prevent the granting of a waiver. Dkt. #36 at 2. However, the Court did not find that these cases provided clear guidance as to how to resolve the specific issues in this case. On remand, both the ALJ and the parties should discuss this legal framework in more detail. And the Government's argument that the "not without fault" provision establishes essentially a strict liability standard is problematic. If true, then if a claimant did not meet this provision, the statutory factors of equity and good conscience would never be considered.

5

> (c) With respect to the overpaid individual only, acceptance of a payment which he either knew or could have been expected to know was incorrect.

20 CFR § 404.507 (emphasis in original). In everyday parlance, subsection (a) means the claimant lied; subsection (b) means the claimant withheld material information; and subsection (c) is akin to a teller providing too much change. Although this section provides the basic framework, as will be discussed, several questions arise about how the ALJ was applying, or should have applied, these provisions.

As noted above, the ALJ found that Plaintiff was at fault in two basic ways—the first is making initial misstatements (or possibly omissions) in the application process in the fall of 2003, and the second is later not disclosing that her income increased. The Court will begin with the first rationale because it is the one on which the parties focus in their briefs. In the end, it is clear that a remand is required for the basic reason that the Court cannot follow, with a sufficient degree of confidence, the ALJ's reasoning. Put in terms of the well-known metaphor used in disability appeals, the ALJ did not build an accurate and logical bridge from the evidence to the conclusion.[4]

A preliminary but important difficulty in assessing the ALJ's analysis is that it was not really an analysis in the traditional sense, but instead mostly a narrative summary. Among other problems, the ALJ did not clearly identify what specific misstatements (or omissions) the ALJ believed Plaintiff made. This vagueness means that the Court has had to speculate about the ALJ's precise thinking.

Another issue to note at the outset is that there is an unaddressed ambiguity lurking throughout the decision about the legal standard the ALJ was using. The ALJ began by stating that

---

[4] *See Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018); *Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) ("We must uphold an ALJ's ruling if it is supported by substantial evidence, [] but that support is missing when the ALJ either fails to build a logical and accurate bridge between the evidence and conclusion or fails to follow the Administration's own regulations in a way that likely bears on the outcome.").

Plaintiff had made "conflicting and confusing" statements. (R. 21.) However, later in the analysis, the ALJ referred to "inaccuracies" on the forms Plaintiff completed. (R. 22.) This raises the question of how the ALJ was applying these three terms. Was the ALJ merely using them in a loose way as synonyms to denote the same general concept? Or was the ALJ imposing separate requirements on Plaintiff, one being that she must have been accurate in all her answers on the forms and the other being a more amorphous duty to be not confusing? One could imagine a situation where person made a series of technically accurate statements but their collective force still left a confusing picture in the reader's mind.

In their briefs, the parties did not examine this question. At one point, the Government stated that the ALJ found that Plaintiff's statements were "inconsistent, inaccurate, *and* confusing," a description lumping all three terms into one homogenized bundle. (Def.'s Mem. at 4, Dkt. No. 36 (emphasis added).) However, later in its brief, the Government seemed to course correct by recognizing the possibility that the ALJ was using "confusion" and "accuracy" as separate concepts. Specifically, the Government argued as follows:

> [Plaintiff] contends that the information she provided *can be parsed to be consistent* (Pl. Br. 5-6), but she develops no argument to refute the ALJ's determination that the information was *confusing*.

Dkt. #36 at 5 (emphasis added). If we assume that the word "consistent" is a stand-in for the word "accurate," then the above argument assumes that the ALJ was imposing a dual requirement on Plaintiff to be both accurate and clear. As will be discussed below, neither the ALJ nor the Government has pointed to authority establishing that a claimant has this additional burden of clarity or non-confusion. Indeed, neither the word nor the concept of "confusion" is found in the Administration's own regulation or in the relevant statute. Being clear or not confusing is not a

requirement the Administration has placed on claimants. Much of Social Security law is arcane, so it is not surprising that claimants' responses to muddled forms can be confusing.

The Court will first consider the more basic question of whether Plaintiff made any inaccurate statements. As best this Court can tell—and again the ALJ's decision is garbled in this respect—the ALJ believed that Plaintiff made two inaccurate statements. They were on two forms. The first is entitled "WORK ACTIVITY REPORT—EMPLOYEE," and it is dated October 16, 2003, the same day Plaintiff met with the Administration employee. (R. 656–64.) The Court will refer to this as the "October form." The second is entitled "WORK HISTORY REPORT," and it is dated November 10, 2013. (R. 246–53.) This will be referred to as the "November form." Both forms asked questions about how many hours Plaintiff worked and her rate of pay on her various jobs. Although the forms cover similar topics, they each asked slightly different questions.

The first alleged misstatement relates only to the October form. The ALJ seems to have believed that Plaintiff made certain representations about her pay and hours on the first part of the form, but then in a later "remarks" section of the same form gave a different and conflicting summary. (*Cf.* R. 657–59 *to* R. 662.) The Court will not describe and go through the specific representations made or the various theories as to why these two parts of this same form might be interpreted to be either contradictory or consistent, as the parties argue in their briefs. First of all, the two statements do not lend themselves to a simple apples-to-apples comparison. The first part of the October form separately lists Plaintiff's rate of pay and hours for each of the three teaching jobs, whereas the later "remarks" section sets forth a composite answer by collectively referring to Plaintiff's jobs "at various colleges & universities." (R. 662.) But a bigger reason why this Court finds it unnecessary to scrutinize these answers further is that Plaintiff argues she did not write the second statement. Instead, it was completed by the Administration employee, as evidenced by

(among other linguistic clues) the shift from first to third person narrator. The ALJ never acknowledged this fact. The Government does not dispute this point. Instead, it falls back on a new argument: that Plaintiff signed the document and thereby adopted the wording chosen by the Administration employee. This argument fails because the ALJ never relied on it. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine [] forbids an Administration's lawyers to defend the Administration's decision on grounds that the Administration itself had not embraced"). Perhaps the ALJ would have agreed with this argument, but it is not a certainty. The ALJ might have found Plaintiff somewhat less at fault because the second statement was not actually written by her. In addition, it is possible that the Administration employee wrote the remarks after Plaintiff signed the document. For all these reasons, the Court finds that this first alleged incorrect statement is not a sufficient basis to show Plaintiff was at fault.

The second alleged incorrect statement is a supposed contradiction between the October form and the November form. On the October form, Plaintiff indicated that she made $30 per hour at two of the three colleges and stated that she made $9,870 for the year at the third college. However, on the November form she stated that she made $50 an hour. The ALJ apparently believed this difference—$30 versus $50 an hour—was a misrepresentation. Here again, the Court finds that this claim rests on shaky grounds. The November form asked different questions than the October form. The November form asked Plaintiff to list the "kinds of" jobs she worked at, rather than list each job individually, and Plaintiff answered by writing in a generic category called "instructor" and stating that she worked at "schools" (plural). This raises the realistic possibility that the $50 figure was meant to be an average for all three teaching jobs. The directions on the form told the claimant that she could, if needed, "estimate" her hours and pay. (R. 247.) For all

9

these reasons, the Court finds that this discrepancy is not substantial enough to conclude that Plaintiff made the type of affirmative misstatement that the ALJ suggested she made.[5]

The Court next considers several diffuse criticisms—not tied to a specific statement on a form—that were sprinkled throughout the ALJ's decision. These harken back to the issue, discussed earlier, that Plaintiff's overall presentation was "confusing" or that she failed to communicate a broader message about her overall financial state. For example, the ALJ stated the following: "It strains credibility to believe that claimant had no awareness or concern that she should not accept Social Security disability payments while she was working substantial wages." (R. 23.) This statement gives the impression that Plaintiff was trying to hoodwink the Administration in a more global way. Another statement is the following: "When the claimant applied for benefits, she did so based on an allegation that she was unable to work at SGA levels." (R. 22.)

These nebulous criticisms raise several concerns. First, as noted above, it is not clear that Section 507 imposes a duty on the claimant to disclose all aspects of her financial situation, especially when not asked to do so, or to make some kind of independent self-assessment about whether she qualified for benefits.[6]

Second, the ALJ's blanket statement that Plaintiff had "no awareness or concern" that her income might be too high ignores Plaintiff's uncontradicted testimony. She testified that she was hesitant to apply, in part, because she was working part-time and hoped to work full-time. As this

---

[5] The ALJ also may have believed that discrepancies existed between the two forms regarding the number of hours worked. However, for the same reasons stated above, the Court finds that the record is too unclear as to whether Plaintiff made a misrepresentation on this issue.

[6] Section 507(b) does refer to the failure to furnish information the claimant should have known was "material." But it is not clear here which piece of information the ALJ believed was material or what is considered to be material under these rules. This is an issue that deserves further discussion on remand.

Court understands Plaintiff's position, she went into the Administration to determine whether she qualified or not and was honest about her situation.

Third, the ALJ's claim that Plaintiff failed to disclose her overall picture is only true if one views the record through a hyper-technical, uncharitable lens. Plaintiff testified that she brought several years of tax returns to the meeting. The returns clearly showed that her income exceeded the SGA level. Plaintiff's answers on the first part of the October form also reinforced this conclusion. She stated that she earned $9,870 from the City Colleges of Chicago job. This income, by itself, exceeded the SGA level. But she additionally provided information about her pay and hours worked at the other two jobs. It is true that Plaintiff did not add up all the numbers and provide a bottom-line total figure, but neither this form, nor apparently any other one, asked her to do so.

Fourth, the ALJ's statement that Plaintiff represented that she could not "work at SGA levels" is also misleading and unfair. Plaintiff never made this specific representation.

In considering the above arguments, the Court notes that Section 507 specifically states that the Administration "will consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) the individual has." The ALJ did not consider this provision. The ALJ gave no weight to Plaintiff's testimony that she was in physical distress from her Crohn's disease when she applied for benefits. She testified that she was "physically and emotionally drained from being sick" and "just [couldn't] deal with all these things." (R. 746.) She gave the following vivid description of how she felt and looked on October 16:

> I was just there to be interviewed. I brought all the paperwork and everything, but I was very waiflike-looking. I was probably, I don't know, maybe 95, 98 pounds. One of the crazy things about Crohn's disease is that it's cyclical, and you go in remission and out of remission, and you don't absorb nutrients, so you become very weak and

11

>very thin, and, and it, it affects you just in, in terms of, like, looking—I, I looked like death warmed over, and I don't know if that made a difference in the interview[.]

(R. 748; *see also* R. 747 ("When I was interviewed, [] I was probably at my weakest point").) In addition to Plaintiff's physical tribulations, she was also facing financial stress because her employment future was uncertain. The ALJ did not acknowledge these facts. The regulations establish that the ALJ should have considered this evidence. Thus, even if Plaintiff made misrepresentations—a conclusion the Court finds has not yet been demonstrated sufficiently—then the "pertinent circumstances" clause in Section 507 suggests that some consideration be given to facts such as her weakened physical condition. On remand, the ALJ should explicitly analyze these pertinent circumstances as part of the overall analysis.[7]

Another possible pertinent circumstance, although not one specifically listed in Section 507, is Plaintiff's claim that she relied on statements made by the Administration employee during the October 16th meeting. As described above, Plaintiff's undisputed testimony is that she disclosed her financial situation and openly expressed her concerns about whether she should even apply for benefits, but then the employee basically encouraged her and told her—or at least gave her the impression to her—that it might be possible to receive disability benefits despite her part-time earnings. The employee talked about, for example, a new Ticket to Work program allowing people to try working while receiving benefits. In light of these statements, Plaintiff may have reasonably believed that she qualified under some unknown exception even if she were making

---

[7] The Court acknowledges that Plaintiff in her opening brief did not specifically raise an argument under the "pertinent circumstances" provision and that the Government then argued that plaintiff had waived any such argument. But Plaintiff's physical problems were hard to miss at the hearing based on the testimony quoted above. In any event, given that this Court would remand this case on other grounds, the Court need not address the waiver argument. One further related point: in assessing pertinent circumstances on remand, the ALJ is also permitted to consider factors that may cut against Plaintiff's claim. For example, Plaintiff was an adjunct professor teaching English, and thus was not limited in her language abilities as some claimants are.

12

income above SGA levels. The ALJ did not consider this testimony but should have done so, based, at a minimum, on the principle that ALJs must address all lines of evidence, especially those contrary to the decision. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

The Court acknowledges the Government's argument that Section 507 states, quite clearly, that the fact that the Administration may have been "at fault in making the overpayment" does mean the claimant is without fault. The Government seems to believe that this precludes Plaintiff from relying on any mistakes or reassurances made by the employee. Plaintiff, in response, argues that she is making a more subtle argument that the employee's statements provided context for understanding plaintiff's own statements. It is not clear based on the text of Section 507 whether this type of reliance argument is permitted.

But the Court notes that there is another provision in these same set of regulations that might speak to this question. This is 20 C.F.R. § 404.510a (hereinafter, "Section 510a"). The Court became aware of this provision because the ALJ referred to it in passing in the decision. (*See* R. 20.) However, the ALJ did not describe it further or rely on it. Neither of the parties discussed it in their briefs. Section 510a states, in pertinent part, as follows:

> Where an individual . . . accepts such overpayment because of reliance on erroneous information from an official source within the [Administration] . . . with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto . . . such individual, in accepting such overpayment will be deemed to be *without fault*.

Based on this Court's reading, this provision seems to support the type of reliance theory Plaintiff is espousing here. Maybe there is a reason why this section is not applicable here. On remand, the ALJ and the parties should explore this possibility.

One final pertinent circumstance deserving mention is Plaintiff's long work history. The Government states that Plaintiff was under a duty to "make the public fisc whole," suggesting she

would be receiving a windfall if she were given a waiver. (Def.'s Mem. at 2 (quoting *Watson v. Sullivan*, 940 F.2d 168, 172 (6th Cir. 1991)). Of course, this inquiry turns in part on whether she was at fault. But if the ALJ is weighing the equities, as the Government is suggesting, then the ALJ should also consider that Plaintiff began working, and contributing to the Social Security fund, in 1967, when she was a teenager, and worked continuously thereafter for decades. (R. 666.) And she did all this while contending with a difficult and fluctuating health problem. Plaintiff is now almost 69 years old.

In sum, the Court finds that the ALJ's first major finding—that Plaintiff was at fault during the initial application—was not sufficiently explained. For this reason alone, a remand is required. But the Court will also consider the ALJ's second major finding, which is that Plaintiff should have later reported that her income increased significantly. The ALJ concluded that Plaintiff knew about this duty from, among other sources, a pamphlet the Administration gave her.

Plaintiff responds with a series of arguments. First, she notes that the pamphlet the ALJ was likely referring to (the record apparently contains a copy of the actual pamphlet so Plaintiff is relying on a more recent version) states that a claimant should report to the Administration if the claimant *takes* a job or becomes self-employed. Plaintiff argues that she did not *start* a new job but merely *continued* working the same jobs she had already disclosed when she applied for benefits; therefore, this provision is not strictly applicable. Second, Plaintiff again advances a reliance theory, arguing that the employee reassured her that she could continue working part-time. Third, Plaintiff argues that the Administration's actions after the initial determination reinforced Plaintiff's belief that she had validly qualified for benefits. On May 27, 2004, the Administration notified her that it was conducting a Continuing Disability Review, and then in September 2004, sent her two separate payments of back benefits. In other words, the

Administration again looked at the issue and again concluded that Plaintiff qualified for benefits. Fourth, Plaintiff argues that her income did not increase in any significant way until sometime in 2005 and that she received benefits only up to May 1, 2005. Therefore, the "record contains no information to determine when within the year [she] earned the additional money." (Pl.'s Mem. at 8, Dkt. No. 34.) The argument is that the Administration revoked her benefits before her income increased significantly.

The Court finds these arguments raise enough questions to require further analysis. This is not to say that Plaintiff is necessarily right in all instances. The record needs more development. And the ALJ's analysis needs more clarity. For example, a finding needs to be made about when Plaintiff's income increased. The Government states that the income "increased dramatically from 2004 to 2005." (Def.'s Mem. at 7.) But this means, at a minimum, that there was a period during which Plaintiff's income had *not* yet increased, raising a question whether Plaintiff would have to repay all the benefits, assuming she is again found at fault. The ALJ should further explore these questions.

To sum up, the ALJ did not provide a clear explanation of what Plaintiff specifically did so as to be at fault. The ALJ also did not fully consider the various possibly pertinent circumstances existing when she applied for benefits. The Court acknowledges that the law in this area is not clear or well developed, making it difficult to evaluate these issues. But the main barrier this Court has in assessing the ALJ's opinion is on the fundamental level of understanding the ALJ's reasoning.

On remand, the ALJ should analyze these issues more fully. The ALJ should also make a finding about the other requirements for a waiver (*i.e.* whether a waiver would defeat the purpose of the Act and whether it would be against equity and good conscience). The ALJ should make

these findings even if the ALJ again finds that Plaintiff did not meet the threshold requirement of showing she was without fault. This will facilitate review if there is a second appeal.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 32) is granted, the Government's motion (Dkt. No. 35) is denied, and this case is remanded for further consideration consistent with this opinion.

ENTERED:

Dated: November 1, 2019

Andrea R. Wood
United States District Judge